UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BERKSHIRE-CRANWELL LIMITED )
PARTNERSHIP, d/b/a Cranwell )
Resort and Golf Spa, )
      Plaintiff )
)
v. ) C.A. No. 11-cv-30194-MAP
)
TOKIO MARINE & NICHIDO FIRE )
INSURANCE CO., LTD. & )
LUMBERMENS MUTUAL CASUALTY CO., )
      Defendants )

**MEMORANDUM AND ORDER REGARDING DEFENDANTS'
MOTIONS FOR JUDGMENT ON THE PLEADINGS**
(Dkt Nos. 25 & 30)

July 6, 2012

PONSOR, U.S.D.J.

## I. INTRODUCTION

Following a settlement of two class actions against it, Plaintiff, Berkshire-Cranwell, L.P., seeks both coverage and costs of defense from its insurers[1], Defendants Tokio Marine Nichido Fire Insurance Co. (U.S. Branch) and Lumbermens Mutual Casualty Co. The three-count complaint seeks: (1) a declaratory judgment that Defendants had a duty to defend the class actions; (2) money damages based on Defendants' breach of their insurance contracts; and (3) money damages under Mass. Gen. Laws. ch. 93A.

---

[1] By agreement of the parties, Carolina Casualty Insurance Company, the third insurer sued by Plaintiff, was removed from the case on December 19, 2011.

Presently before the court are a Motion for Judgment on the Pleadings by Tokio Marine (Dkt. No. 25) and a similar motion from Lumbermen's (Dkt. No. 30). For the reasons set forth below, Defendants' motions will be allowed.[2]

## II. BACKGROUND

Plaintiff operates a resort and spa in Lenox, Massachusetts offering dining options and a variety of health treatments. The resort charged guests a "service fee" at the restaurants and spa. However, instead of turning the fees over to resort employees who performed the services, the resort kept the money for itself.

The resort employees sued over the practice. The first lawsuit was filed in April 2007 by Doreen Black and three other employees working at the resort's spa (the "Black" action). Black's complaint, filed in Berkshire Superior Court, alleged that the resort violated the Massachusetts Tips Act, Mass. Gen. Laws ch. 149, § 152A, and the Wage Act, Mass. Gen. Laws ch. 149, § 148, and that the resort further incurred liability for breach of contract, conversion, and breach of the implied covenant of good faith and fair dealing. The Black lawsuit was approved as a class

---

[2] Tokio's motion also seeks a stay and bifurcation. These requests will be denied as moot in view of the court's dismissal of the complaint.

action in May 2007.

A second lawsuit was filed in May 2007 by Stacy Wechter and two other employees of the resort's Food and Beverage Department (the "Wechter" action). The Wechter action made identical claims to the Black suit, and it too was approved as a class action, in June 2007.

It is undisputed that, for reasons unexplained, Plaintiff never informed either Defendant insurance company of the lawsuits until February 2011, about three and a half years after they were filed. At this late date, Plaintiff demanded both coverage and defense in the two actions from the insurers.

At the time of the lawsuits, Plaintiff had in-force Commercial General Liability ("CGL") insurance policies that contained Employee Benefit Liability ("EBL") riders from both Defendants. Defendants declined to provide coverage or to defend, contending that the claims that underlay the class actions were not covered by their policies, and that Plaintiff had in any event waited far too long to notify them of the employees' claims.

After its requests for coverage and costs of defense were rejected, Plaintiff brought this lawsuit against both Defendants. Plaintiff grounds its claim to coverage on two sections of Defendants' policies.

3

First, the policies provided coverage when an agent of the insured caused the loss of tangible property of another. Plaintiff contends that the unpaid "service fees" claimed by the <u>Black</u> and <u>Wechter</u> plaintiffs constituted tangible property and that, thus, the claims for them were covered. Second, Plaintiff argues that the tips were "employee benefits" covered under the policies' Employee Benefits Liability riders.

Plaintiff points out that even if it was not entitled to coverage, Defendants nonetheless had a duty to defend. Massachusetts law sets a low bar to trigger a duty to defend. Plaintiff argues that at the very least its claims satisfy this generous standard.

Defendants disagree with all three of these contentions, and they argue further that Plaintiff's claims were not made within the time limits required by the policies. A review of the policies is necessary to provide background for the parties' disagreements.

Defendants issued Plaintiff CGL coverage on virtually identical policy forms. The policies both contain the following language:

1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damages" to

> which this insurance applies. We
> will have the right and duty to
> defend the insured against any
> "suit" seeking those damages.

(Dkt No. 25, Ex. C [Tokio], Insurance Agreement at I(1)(a); Dkt. No. 31, Ex. B [Lumbermens], Insurance Agreement at I(1)(a).)

Both policies define "property damage" as:

> b. Loss of use of tangible property that is not physically injured. All loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Dkt No. 25, Ex. C [Tokio], Insurance Agreement at V(17)(b); Dkt. No. 31, Ex. B [Lumbermens], Insurance Agreement at V(17)(b).)

Both Defendants' CGL policies also came with EBL riders that provided coverage in the event that the policy holder became involved in disputes with its employees regarding employee benefits issues. However, unlike the CGL policies, the Defendants' EBL riders are not identical.

Lumbermens attached two EBL riders to Plaintiff's CGL policy: a New York-specific one, and one designed for the rest of the country. Both riders define employee benefit programs as:

> group life insurance, group accident or health insurance, profit sharing plans, pension compensation insurance, unemployment compensation, social security, and death benefits insurance.

5

(Dkt. No. 31, Ex. B, EBL Rider at ¶ V, N.Y. EBL Rider at ¶ V(A).)

Further, the non-New York rider promises:

> we will pay those sums that you are legally obligated to pay "as damages" because of any claim made against the Insured by any employee . . . for injury caused by any negligent act, error or omission of the Insured . . . in the administration of the Insured's "employee benefit program" . . . .

(Id., EBL Rider at 1(A).)

The New York rider makes a substantially similar promise, albeit with slightly different wording. (Id., N.Y. EBL Rider at 1(A).)

Tokio Marine also attached an EBL rider to the CGL policy it issued to Plaintiff. Its rider defined an employee benefit as:

> a program providing some or all of the following benefits to 'employees,' whether provided through a 'cafeteria plan' or otherwise
>     a. Group life insurance, group accident or health insurance, dental, vision, and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;
>     b. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans, and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such

benefits;
            c.  Unemployment insurance, social security
                benefits, workers' compensation and
                disability benefits;
            d.  Vacation plans, including buy and sell
                programs; leave of absence programs,
                including military, maternity, family,
                and civil leave; tuition assistance
                plans; transportation and health club
                subsidies; and
            e.  Any other similar benefits designated in
                the Schedule or added thereto by
                endorsement . . . .

(Dkt. No. 39, Ex. A, EBL Rider at ¶ G(4).)

Tokio Marine's policy promises that it will:

pay those sums that the insured becomes legally
obligated to pay as damages because of any act,
error, or omission of the insured, or of any other
person for whose acts the insured is legally
liable, to which this insurance applies. We will
have the right and duty to defend the insured
against any "suit" seeking those damages. However,
we will have no duty to defend the insured against
any "suit" seeking damages to which the insurance
does not apply . . . .

(Id. at ¶A(1)(a).)

Tokio's policy further limits its promise to pay damages when "[t]he act, error or omission, is negligently committed in the 'administration' of your 'employee benefit program . . . .'" (Id. at ¶ A(1)(b)(1).)

### III. DISCUSSION

A.  Standard of Review

To survive a motion for judgment on the pleadings, the complaint must plead facts that raise a right to relief above the speculative level, such that the entitlement to

7

relief is plausible. <u>Citibank Global Markets v. Rodriguez Santana</u>, 573 F.3d 17, 23 (1st Cir. 2009). The court must accept as true all of the complaint's well pleaded facts and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Id.</u>

 B. <u>Coverage Provisions</u>.

 Interpretation of an insurance policy is a matter of law for the court. <u>Berkshire Med. Ctr. v. U.W. Marx, Inc.</u>, 644 F.3d 71, 75 (1st. Cir. 2011) (construing Massachusetts law). According to the Massachusetts Supreme Judicial Court:

> "The interpretation of an insurance contract is no different from the interpretation of any other contract, and we must construe the words of the policy in their usual and ordinary sense."

<u>Metropolitan Property and Cas. Ins. Co. v. Morrison</u>, 951 N.E.2d 662, 671 (Mass. 2011) (citations omitted). If there is doubt about the meaning of a term in the policy, the court considers what an objectively reasonable insured reading the relevant policy language would expect to be covered. <u>Id.</u> Ambiguity is construed in favor of the insured.

 C. <u>Duty to Defend</u>.

 As noted above, the insurer's duty to defend requires a more generous reading of a policy's language than the sort undertaken in construing whether a policy provides coverage.

8

"If the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense." Sterilite Corp. v. Continental Cas. Co., 458 N.E.2d 338, 340 (Mass.App.Ct. 1983).

D. Tangible Property.

As noted above, Plaintiff contends that "tangible property" included the service fees. Thus, it says, when the Black and Wechter class action plaintiffs made claims for conversion, they were really alleging that Plaintiff here, the resort owner, took their tangible property -- thereby entitling Plaintiff to coverage under Defendants' policies.

The court must resolve both whether Plaintiff's contention would be enough to trigger Defendants' threshold duty to defend and whether Plaintiff was entitled more broadly to coverage under the policy. The court concludes that -- even applying a generous reading of the policy terms -- service fees were not "tangible property" under either policy, and therefore Plaintiff is not entitled to defense or coverage from Defendants.

Courts construing the tangible property provision of a standard CGL policy generally take one of two approaches. Some courts have reasoned that cash may, at least in certain

circumstances, constitute a tangible thing.  See Capitol Indem. Corp. v. Wright, 341 F. Supp. 2d 1152, 1159 (D. Nev. 2004); Hortica-Florists' Mut. Ins. Co. v. Pittman Nursery Corp., No. 07-1119, 2010 WL 749368, at *5 (W.D.Ark. Mar. 2, 2010).  The second group reasons that the right to money is intangible, especially when it does not involve physical currency.  See In re Oakley, 344 F.3d 709, 713 (7th Cir. 2003); Mut. Serv. Cas. Ins. Co. v. Coop. Supply Inc., 699 F. Supp. 1438, 1442 (D. Mont. 1988); Johnson v. Amica Mut. Ins. Co., 733 A.2d 977, 978 (Me. 1999).  A review of both approaches reveals that the service fees withheld from Plaintiff's employees could not fairly be considered tangible things.

In one of the cases that appears to favor Plaintiff, Wright, a group home employee took an Alzheimer's sufferer living at the home to a bank. 341 F. Supp. 2d at 1153.  The employee instructed the man with Alzheimer's to withdraw money from the bank -- in cash form -- and then took the money for his own purposes.  Id.  The family of the man with Alzheimer's sued the group home, which made a claim with its insurer under its CGL policy.  Id. at 1153-54.  The insurer refused to pay, claiming that the conversion of the money did not involve tangible property.  The court concluded that the conversion of actual paper currency involved tangible

property.  Id. at 1159-60.

Hortica-Florists also involved the conversion of cash. In that case, a flower company manager required employees to pay him $1,000 in cash in order to retain their employment. 2010 WL 749368 at *2.  The employees sued, and the flower company made a claim against its insurer.  The insurer refused coverage on the grounds that the payments did not involve tangible property.  Id.  The court in Hortica-Florists agreed with the flower company that the payments did constitute tangible property, because the manager asked for the payments in actual paper currency.  Id. at *5.  It is significant that in both Wright and Hortica-Florists, unlike here, the money was actually misappropriated as a physical object.

In contrast, cases reaching the conclusion that conversion of money does not constitute tangible property tend to involve non-cash transfers of funds.  In Johnson, a man brought a suit against insureds, alleging that they converted his bank account funds and stole reimbursement payments from him.  733 A.2d at 978.  The insureds asked their insurer to pay, and it refused, claiming that the funds were not tangible property.  The Maine Supreme Court agreed with the insurer, holding that bank accounts and the right to payments were not tangible things.  Id.

The court in Coop. Supply, reached a similar conclusion about the conversion of non-currency monies. 699 F. Supp. at 1439. In that case, an employee sued an employer for, among other things, converting her wages. Id. The employer's insurer refused to pay or defend on the grounds that the conversion of such wages did not involve tangible property. Id. at 1442. The court agreed with the insurer that the employee's right to payment of wages was not tangible property.

Judge Posner in In re Oakley addressed whether money constituted tangible or intangible property for purposes of Indiana's bankruptcy exemption statute. 344 F.3d at 713. In that case, Judge Posner, with characteristic piquancy, emphatically held that money was intangible.

> The distinction that we are emphasizing is between use value and exchange value. A napkin has value; you can wipe your mouth with it. Wallpaper has value; you can decorate your walls with it. People do not wipe their mouths with money or paper their walls with it. They value cash only because they can use it to obtain useful goods like napkins and wallpaper. They value money in the bank for the identical reason. Oakley points out that if you lose your checkbook, your bank account is intact, but if you lose cash, it's gone. It may not be. If cash is stolen from your house, and you have burglary insurance, the insurance company will restore the money to you -- but not in cash, instead by check, which you'll be happy to accept in lieu of cash. If what was stolen from you was a $100 bill, you could not complain if the insurance company wrote you a check for that amount, rather than giving you a $100 bill; or if it gave you five $20 bills instead of one $100

> bill -- which shows that the piece of rag paper, the tangible embodiment of cash money, is no more indispensable than the stolen checkbook or credit card. In contrast, if your chair were stolen, the insurance company might replace the chair or give you a check for its value, but the one thing it would not do would be to give you cash equal to the value of the check and tell you, sit on this.

Id.

To phrase the distinction differently, one hundred dollars fraudulently diverted from my checking account is intangible; the framed one hundred dollar bill over the mantel that was the first money earned by my "Forty-niner" great-great-grandfather during the California gold rush is tangible.

When the Black and Wechter plaintiffs alleged that their tips, characterized as service fees, were wrongfully converted, they were clearly alleging that Plaintiff took their money for its exchange value and not in the form of some physical object or objects. There was, with perhaps an occasional exception, no physical handover of tangible currency from the employees to Plaintiff. Instead, Plaintiff simply retained the service fees, diverting them into its general account. In this circumstance, no "tangible property" was involved, no duty to defend arises, and no coverage adheres.

Plaintiff contends that, at least in certain circumstances, its guests paid for restaurant and spa

13

services (including the service fee) with cash; tangible folding money and coins, it says, were sometimes used.  This fact, assuming it is true, does not assist Plaintiff for two reasons.  First, Plaintiff does not allege that the service fee portions of these payments were ever physically in the hands of Plaintiff's employees before being diverted to Plaintiff's accounts.  Unlike in <u>Wright</u> and <u>Hortica-Florists</u>, no identified, tangible cash was ever misappropriated, even though the fee may have been part of a larger cash payment.  Second, even if the service fee was placed, now and then, in the employee's hand, with the requirement that this physical cash be tuned over to Plaintiff, the fee was still not retained for its tangible significance, like a framed hundred dollar bill, but merely deposited -- based on its intangible transactional value -- into Plaintiff's bank account.  To the extent that <u>Wright</u> and <u>Hortica-Florists</u> suggest that the transfer of hard currency or coin should alter the court's interpretation of the "tangible property" provisions of the insurance policies n question here, these decisions are not controlling and the court declines to follow them.

In sum, the "tangible property" provisions in the policies triggered neither a duty to defend nor coverage.

    E.   <u>The Employee Benefit Liability Riders</u>.

Plaintiff also argues that the Black and Wechter claims involved errors in "Administration of the Employee Benefits Programs," requiring both Defendants to defend it under their respective EBL riders and to provide coverage under the same provisions. Defendants counter that an "employee benefit plan," as defined in the EBL riders, only covers fringe benefits, and not the sort of wage and hour violations that the Black and Wechter lawsuits alleged.

Defendants have the stronger argument. Both EBL riders define "employee benefits" by describing a laundry list of fringe benefits, most of which involve either health or retirement. In interpreting insurance contracts Massachusetts courts apply the principle of ejusdem generis, "which holds that general terms which follow specific ones [are limited] to matters similar to those specified." Dryden Oil. Co. of New England v. Travelers Indem. Co., 91 F.3d 278, 288 (1st Cir. 1996) (construing Massachusetts law) (internal citations omitted). Applying that principle here, it is apparent that a reasonable insured would find the list of fringe benefits under the definition of "employee benefits" to be inclusive of only traditional health, welfare and retirement benefits, and exclusive of wages such as cash tips. Here too, even a generous reading of the EBL rider terms would provide Plaintiff neither coverage nor

defense.

F. <u>Failure to Timely Notify</u>.

The amount of time an insured has to report a loss may depend sometimes on the type of policy; so called "claims made" policies may be treated differently from "occurrence based" policies. Under a "claims made" policy, timely compliance with the policy's reporting requirement will be a strict condition of obtaining coverage. The insurer is not required to show prejudice to deny coverage for late notice. <u>Chas. T. Main, Inc. v. Fireman's Fund Ins. Co.</u>, 551 N.E.2d 28, 29 (Mass. 1990). In contrast, in an "occurrence based" policy, coverage will be extended so long as the loss occurs within the policy period regardless of the date of discovery. <u>Id.</u> With these policies, an insurer must demonstrate prejudice in order to deny coverage. <u>Id.</u>

Plaintiff appears to argue that at least some of Defendants' policies and/or riders are "occurrence based," and that therefore Defendants cannot deny coverage without demonstrating prejudice, which Plaintiff says Defendants cannot do.

In this case it is unnecessary for the court to attempt to parse out whether some of the policies in question were "occurrence based," rather than "claims made," and, if so, which ones. It is, in any event, abundantly clear from the

undisputed record that Defendants suffered substantial prejudice from Plaintiff's astonishingly protracted delay in notifying them of the class actions.

When an insured agrees to a settlement, and there is "nothing left for the insurer to do but issue a check," no showing of prejudice is required, regardless of the type of policy. See Augat, Inc. v. Liberty Mut. Ins. Co., 571 N.E.2d 357, 361 (Mass. 1991). Here, while the notification may have arrived a bit before the actual check-issuance stage, it came well beyond any reasonable point to avoid prejudice.

To begin with, the parties agree that Plaintiff failed to notify Defendants of either lawsuit until 2011, well more than three years after they were filed in 2007. The following actions all took place in Berkshire Superior Court before Defendants ever learned of the lawsuits:[3]

- Class certification was granted for the Wechter action,(Dkt. No. 25, Ex. B), and the Black action, (Dkt. No. 25, Ex. A), on February 24, 2010;
- Several motions and cross motions for summary judgment were filed and disposed of in both cases

---

[3] "It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matter at hand." Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990).

17

> between 2009 and 2010, (Dkt. No. 25, Exs. A & B);
> - At the hearing on these motions, Plaintiff disclosed that settlement discussions in both cases were already well underway.

In sum, the transit of both lawsuits was all but over before Defendants even learned of them. In such a situation, it would be unfair to expect Defendants to step in at the last minute to shoulder settlement and defense costs without any opportunity to shape the course of litigation.

G. <u>Mass. Gen. Laws ch. 93A Claims</u>.

Under Mass. Gen. Laws ch. 176D, § (3)(9)(d), an insurer must conduct a reasonable investigation before denying a claim. Failure to do so is an unfair business practice under Mass. Gen. Laws. ch. 93A. Plaintiff argues that Defendants failed to undertake such a reasonable investigation here.

Given the analysis above, no Chapter 93A claim can stand. Once a court has concluded that an insurer's denial of coverage and denial of a duty to defend is valid, there can be no chapter 176D claim. See <u>Brazas Sporting Arms v. Am. Empire Surplus Lines Ins. Co.</u>, 220 F.3d 1, 9 (1st Cir.

2000) (construing Massachusetts law).[4]

## IV. CONCLUSION

For the foregoing reasons, Defendant Tokio Marine's Motion for Judgment on the Pleadings (Dkt. No. 25) and Defendant Lumbermens' Motion for Judgment on the Pleadings (Dkt. No. 30) are hereby ALLOWED. Those aspects of Tokio's motion that seek a stay or bifurcation are DENIED as moot. The clerk will enter judgment for Defendants. This case may now be closed.

It is So Ordered.

    /s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

---

[4] Even setting aside <u>Brazas</u>, the allegations of the complaint appear insufficient to support any claim for failure to make a reasonable investigation.